**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

IN RE:                                          )
                                                )
ROSA MOSAIC & TILE COMPANY,  )          **Case No. 21-31649-crm**
                                                )
                                                )          **Chapter 11**
        DEBTOR                          )
                                                )
_____ )

* * * * *

**<u>MEMORANDUM OPINION</u>**

This matter is before the Court on the motion of the Debtor, Rosa Mosaic & Tile Company ("Rosa" or the "Debtor"), for an order authorizing Rosa to reject the collective bargaining agreement (the "CBA") into which Rosa entered with The Tile, Marble, and Terrazzo Journeyman and Finishers International Union Bricklayers and Allied Craftworkers Local Union No. 4 of Indiana and Kentucky (collectively, the "Union"), pursuant to 11 U.S.C. § 1113 of the Bankruptcy Code. Rosa and the Union entered into a CBA commencing on June 1, 2021, but where negotiations between the parties have reached an impasse, Rosa now seeks to reject the CBA after having its proposals rejected by the Union, as set forth more fully below. For the reasons set forth below, the Court GRANTS Rosa's [R. 110] Motion to Reject the CBA ("Motion to Reject").

* * * * *

**BACKGROUND**

1

Established in 1937, Rosa is a Louisville-based tiling company that provides natural stone, tile, and terrazzo installation services throughout Kentucky, Indiana, Tennessee, Ohio, and West Virginia.[1]  Anna C. Tatman ("Tatman") is the President and 51% majority owner of Rosa, and her brother John J. Cristofoli ("Cristofoli") owns the remaining 49% ownership interest and serves as Rosa's Secretary, Treasurer, and Operations Manager.  Rosa pays approximately $6,800 in rent each month to Wilder Park Properties, LLC ("Wilder Park"), a real estate holding company co-owned by Rosa's principles Tatman and Cristofoli, for leased office and warehouse space in Louisville.  Additionally, Cristofoli and Tatman own Venosa, LLC ("Venosa") through two trusts.  Venosa, which Tatman and Cristofoli organized in 2017, manufactures precast terrazzo products.

On or about June 5, 2019, Rosa entered into a guaranty agreement with PNC Bank ("PNC"), whereby Rosa guaranteed debt owed by Venosa to PNC.  Rosa has had a long-term banking relationship with PNC, and as part of this relationship, Rosa has maintained a number of bank accounts at PNC.  Rosa had also entered into an unsecured, revolving line of business credit with the bank, but in September of 2020, after a financial review of Rosa and each of the other entities associated with it, PNC informed Rosa that PNC was withdrawing the line of credit because Rosa's risk profile had increased to an unacceptable level.

---

[1] The undisputed facts contained herein were taken primarily from the affidavit of Rosa's President and majority share owner, Anna C. Tatman ("Tatman Affidavit") and summarized.  *See* Tatman Affidavit, [R. 102-1].

Tatman and Cristofoli are also the grantors of two trusts to Vesta Tile & Stone, LLC ("Vesta"), a commercial flooring company organized in 2010 that primarily performs work in Kentucky and southern Indiana.  Vesta operates as a subcontractor and provides tile and carpet installation to the contracting and development community, but unlike Rosa, does not self-perform terrazzo installation.  Vesta was created to bid on projects where Rosa was not competitive, specifically "tenant fit-out" projects like restaurants, hotels, retail, office buildings by developers, and other similar projects.  These commercial projects often utilize product lines that require less skill to install.  In contrast, Rosa specializes in more complex projects involving terrazzo installation and mud-set tile installation.[2]  Vesta has subcontracted work to Rosa and to other companies but maintains separate operations, projects, assets, equipment, and field employees.  Tatman does not perform services for Vesta and does not receive compensation from Vesta apart from ownership interest.  Vesta also pays rent to Wilder Park under a separate lease for warehouse space located in Louisville. Unlike Rosa, Vesta has never been a party to any collective bargaining agreement.  On September 12, 2019, the Union filed a Complaint against Rosa in the U.S. District Court for the Southern District of Indiana[3] ("Vesta Litigation"), alleging that Vesta is an alter ego of Rosa under the Employee Retirement Income Security Act ("ERISA"), and thus liable for fringe benefit

---

[2] There is a distinction between "mud-set" tile installation and "thin-set" tile installation; mud-set is more labor-intensive and generally requires more skill.  Vesta focuses on the installation of thin-set tile as well as the installation of other products where less skill is required, such as vinyl and carpet tiles or squares.  Rosa meanwhile specializes in terrazzo installation, which like mud-set, requires highly skilled craftworkers and more exacting conditions.

[3] *Knowles, et. al v. Rosa Mosaic and Tile Co. et al.*, S.D. Ind. Civil Case no. 1:19-cv-03877-SEB-DLP.

contributions for each hour worked under the CBA by each entity's employees. That litigation is still pending.

Locally, Rosa is just one of two unionized stone, tile, and terrazzo installation companies in Kentucky. Rosa and the Union entered into a CBA effective June 1, 2021 through May 31, 2023, [R. 131-2; R. 137-6] (the "Current CBA"), which is now the subject underlying this contested matter. In recent years, the demand for the high-skilled labor provided by Rosa has significantly decreased. Specifically, there is a trend in the tile-setting industry toward the aforementioned "tenant fit-out" projects (i.e. restaurants, hotels, and retail spaces) which often utilize product lines that require less skill compared to mud-set or terrazzo installation. Due to this trend, Rosa claims it is unable to effectively bid on such projects where Rosa is required under the CBA to pay its workers the same rate regardless of the skill involved, resulting in high labor costs for projects requiring less skill. Unable to compete in the bidding on these competitive projects, Rosa has experienced financial difficulty, which was further compounded by Rosa's costs defending itself in the Vesta Litigation. These factors collectively led to the decision by Tatman and Cristofoli for Rosa to file for bankruptcy.

## PROCEDURAL HISTORY

On August 6, 2021, Rosa filed its petition under Chapter 11 of the Bankruptcy Code. On October 8, 2021, Rosa sent a correspondence to the Union, making the following five proposed modifications to the terms of the CBA, which were ultimately rejected at the parties' settlement conference:

1. Allow lower pay schedule for Commercial tile setters and Commercial tile finishers.  For Commercial tile setters, the minimum hourly base pay would be $18.00 per hour and for Commercial tile finishers the minimum hourly wage would be $15.00 per hour.  All Traditional tile, marble, and terrazzo setters and finishers would remain exactly as they are under the parties' current collective bargaining agreement.  Setting the above minimum hourly rates for Commercial tile, marble, and terrazzo setters and finishers would allow the Debtor to compete for jobs that non-union companies are currently receiving and for which the Debtor cannot currently provide a competitive bid. … [T]he current wages and fringe benefits would continue to result in the loss of business and not allow the Debtor to successfully reorganize.

2. The Commercial tile, marble and terrazzo setters and finishers would be covered by a separate health plan with Anthem Blue Cross Blue Shield, in which the Debtor would pay 80% toward an individual or family health plan.  In addition, the Commercial tile, marble and terrazzo setters and finishers would be covered by a separate 401(k) matching plan.  The Traditional tile, marble and terrazzo setters and finishers would retain the same union benefits they are currently receiving under the present collective bargaining agreement.[4]

3. The Market Recovery Program, which is almost never utilized by the Debtor, would be eliminated so as to allow the Debtor's employees to retain the 1% of wages contributed to this program.[5]

4. An apprentice program shall be provided by the Union in Louisville and the governing body of said program would be locally organized.  Currently, any prospective employee who wants to enter the apprentice program has to travel approximately 2 ½ hours to the Indianapolis training center.  The Debtor's prospective employees have not wanted to make this trip two times per month on Saturday.  In the alternative the union would pay for the Debtor's training program in Louisville.

---

[4] Currently, Rosa pays $5.25 of insurance per hour of covered work under the CBA, which Tatman testified is relatively expensive.  *See* January 25, 2022 Transcript, [R. 156], Tr. 156:23–157:8.  Unless stated otherwise, all "Tr." transcript cites are in reference to the [R. 156] transcript from the January 25, 2022, evidentiary hearing on Rosa's Motion to Reject.

[5] The third proposal refers to the Market Recovery Program, a program that "assists in maintenance or improvement of market share in a particular market, and the program exists to enable a union to assist in financing bids placed by contractors signatory to a collective bargaining agreement on targeted projects."  Union's Objection to Motion to Reject ("Objection"), [R. 126 at 7].  The Market Recovery Program is financed by employee wage deductions.  *Id.*

5.  The litigation against Vesta Tile and Stone would be dismissed under the condition that all Vesta workers would be provided the opportunity to vote on whether to unionize.  The Union and the Debtor would accept the vote of the Vesta employees and move forward.  The current litigation now pending with the Federal District Court for the Southern District of Indiana has been extremely time consuming and detrimental to the operation of the Debtor.  The owners of the Debtor and Vesta have had to contribute countless hours in document production, document review, depositions and preparation that has taken them away from the operation of the Debtor.  If this litigation were to continue against Vesta only, the owners would have to continue to divert their attention from the operation of the Debtor as a result of the time consuming process this litigation has taken and will continue to take in the future.[6]

*See* [R. 137-1] ("Rosa's Proposals").  Rosa's Proposals were based on financial projections through FY 2025 as prepared by Tatman.  Motion to Reject at 9-10.  The projections were calculated using Rosa's operating reports from January 1, 2021, through August 31, 2021.  Tr. 162:23–163:2.  *See* Debtor's Reply to Union's Objection ("Reply"), [R. 129 at 4].  The August Operating Report reflected an earned profit from January 2021 through August 2021 of $301,460.  [R. 131-34 at 1–33] ("August 2021 Operating Report").  The projections indicated the following profit projections:

| Year | Profit Projection Submitted with Proposal |
|------|-------------------------------------------|
| 2021 | $111,288.71 |
| 2022 | $104,432.30 |
| 2023 | ($46,333.12) |
| 2024 | ($89,061.88) |
| 2025 | ($204,139.96) |

---

[6] The fifth proposal involves the request that the Union terminate the Vesta Litigation, where Rosa has incurred more than $310,000 in litigation costs defending itself in that lawsuit.  Tatman Affidavit at 7.

*See* Rosa's Proposals at 4–5.  At the Union's request, Rosa also provided tax returns dating back to 2015, which establish the following information about Rosa's Ordinary Business Income:

| Year | Ordinary Business Income |
|------|--------------------------|
| 2015 | $426,202 |
| 2016 | $1,808,209 |
| 2017 | $2,218,942 |
| 2018 | $1,634,542 |
| 2019 | $593,433 |
| 2020 | $583,090 |

*See* [R. 131-4; R. 131-5; R. 131-6; R. 131-7; R. 131-8; R. 131-9] (collectively "Rosa's Tax Returns").

Rosa's Proposals were collectively rejected by the Union at the parties' October 22, 2021, settlement conference.  Motion to Reject at 6.  On November 17, 2021, Rosa offered to meet for a second settlement conference on either November 22 or 23.  *Id.* at 6–7.  However, the second conference never took place, as the Union filed a Motion to Dismiss debtor's bankruptcy petition ("MTD"), [R. 93], on November 19, 2021, citing Rosa's bad faith negotiations as grounds for dismissal.  One of the Union's arguments was that pre-petition payment to insiders demonstrated bad faith, where Debtor paid $751,884.79 to insiders in the year preceding the bankruptcy.  [R. 93-2 at 14–15].  In Debtor's Objection to the MTD ("Objection to MTD"), [R. 102], regarding its alleged insider payments, Rosa explained that $92,411.52 was paid as salary to Tatman and $100,983.47

as salary to Cristofoli, and approximately $203,500 was disbursed in October 2020 to Venosa as a capital contribution to Venosa. Objection to MTD at 14. Rosa stated that, at the time, Venosa was experiencing difficulties with cash flow, and Tatman and Cristofoli were concerned this would result in a default on one of its loans where Rosa would be required to pay as a guarantor. *Id.* An additional approximate $20,000 was disbursed to Venosa in July 2021 for the same reason. *Id.* The remaining insider distributions are funds that remain in an account jointly owned by Cristofoli and Tatman, which were set aside in anticipation of pass-through tax obligations. *Id.* A hearing on the MTD was held on December 9, 2021, and an Order was entered, [R. 108], denying the motion on December 10, 2021.

On November 24, 2021, the Union submitted a counterproposal that Rosa resume contributions to the Louisville Pension Fund and the IPF to avoid withdrawal liability of $721,037. *See* [R. 131-33]. Rosa rejected this offer, *see id.*, explaining in the Reply that "it was better to incur a withdrawal liability of potentially more than $700,000 than it was to continue participating in a massively underfunded pension and continuing to bear the ongoing burden of the Debtor's proportionate share of the unfunded liability, particularly when the Debtor had no say over the management of the funds while they performed abysmally during the most favorable investment environment in the history of the markets. The plan's underfunding problems have persisted for more than a decade." Reply at 6–7. Rosa further asserts that "the Debtor made all of its required contributions, including catch-up contributions intended to cure the unfunded liability, and the S&P 500 has increased more than 400%, but the

Union's pension is in worse shape than ever before, with the Debtor's share of the local's unfunded liability having risen more than sixteen-fold to $195,093 and its share of the internationals unfunded liability up 162% to $496,424." *Id.* at 7.

Unable to reach an agreement with the proposals, Rosa filed the underlying Motion to Reject on December 15, 2021. Accompanying the Motion to Reject, Rosa provided updated financial projections based on its financial performance in September, October, and November. [R. 110-3; R. 110-4]; *see* Reply at 4. This included the results from two significant jobs that were underway in Fall of 2021, thereby reflecting Rosa's most recent financial circumstances. Reply at 4. Additionally, Debtor specified that the original projections provided estimates of Rosa's cost of materials based on the ratio of materials cost to total billings that Rosa experienced in 2020. *Id.* However, actual materials costs for 2021 show that Debtor was experiencing materials cost increases from 7% to 15% resulting in additional costs of nearly $400,000, which put Rosa into financial loss in the projections. Reply at 4–5. Rosa's November Operating Report reflected a profit of $234,790 and cash assets of $626,981. *See* [R. 131-34 at 101–129] ("November 2021 Operating Report"). Rosa explains that it aims to maintain approximately $500,000 in cash assets because PNC discontinued Rosa's line of credit as explained above, and Rosa must maintain a cash position sufficient to cover all up-front costs for the jobs on which Rosa bids. Reply at 9. The updated projections indicated the following profit projections:

| Year | Profit Projection Submitted with Motion |
|------|------------------------------------------|

| 2021 | ($14,176) |
| 2022 | ($367,610) |
| 2023 | ($386,040) |
| 2024 | ($159,762) |
| 2025 | ($191,511) |

*See* [R. 110-3]. Also accompanying the Motion to Reject, Rosa provided a list of thirty-seven projects Rosa considered bidding on in 2020 and 2021 before deciding it ultimately could not compete with nonunion bidders. *See* [R. 110-5]; Motion to Reject at 9. Rosa provided another list of fifty-five projects in 2020 and 2021 where Rosa did place a bid but was rejected in favor of a nonunion competitor. *See* [R. 110-6]; Motion to Reject at 9. Rosa claims to be competing with at least twenty-nine nonunion tile and terrazzo contractors in the region. Motion to Reject at 10. In the Motion to Reject, Rosa claims to have "implemented all possible paths to reducing costs," including:

(1) Tatman and Cristofoli did not receive W-2 income for October through December 2020 or for January, February, and July through September 2021;

(2) Rosa terminated its contract with its business development contractor to save on the monthly retainer and expenses, averaging $2,000 per month;

(3) Rosa introduced a high-deductible health benefits plan and health savings account to minimize health insurance costs, saving 10% of health benefits costs;

(4) Rosa outsourced its payroll function in July 2020 when its payroll administrator retired, saving $11,380.00 per year;

(5) Rosa did not replace its project manager when he left for another opportunity in January of 2021;

(6) Rosa took certain actions, in conjunction with its bank and bonding company, to reduce annual accounting fees by 10%.

*Id.* at 11.

On December 22, 2021, the Union made a second counterproposal to Rosa that (1) the Union and Funds would forego any claim against Rosa in the Vesta Litigation for the period in the pending lawsuit and for the period subsequent to the audit period covered in the pending lawsuit in exchange for Vesta signing a CBA or Rosa resuming all work performed by Vesta; (2) the Funds would forego all withdrawal liability claims if Rosa resumes contributions to the IPF and Louisville Pension Fund; and (3) the Union would forego the June 2022 wage increase mandated by the current CBA. *See* [R. 137-2]. The Union asserts that this proposal would eliminate $1,200,000 in the claims in the Vesta Litigation, as well as eliminate the $721,037 in withdrawal liability debt. Objection at 10. Rosa responded by stating it could not agree to the terms involving the Vesta Litigation. *See* [R.137-2].

On December 30, 2021, the Union filed its Objection to Rosa's Motion to Reject. The Union argued that Rosa failed to meet specific elements of Section 1113: "A) Rosa failed to bargain in good faith; B) Rosa's bargaining proposals were not based on complete and reliable information; C) the proposed modifications to the CBA are not necessary for the reorganization; D) all relevant information has not been produced; E) all parties are not treated fairly and equally; F) the Union acted in good faith in rejecting Rosa's bargaining proposal; and G) the equities favor denying Rosa's Motion." Objection at 3–4. Among other arguments, the crux of the Union's argument is that Rosa is currently, and

historically, a profitable entity. The Union emphasizes Rosa's tax returns as well as its most recent profits and cash assets to illustrate this point. *Id.* at 11–12. The Union also points to Rosa's $25,000 donation to the University of Louisville Research Foundation made within ninety days prior to the bankruptcy filing to demonstrate Rosa's ability to pay without the need for bankruptcy. *Id.* at 2, 14, 19.

Rosa filed its Reply to the Objection on January 6, 2022. In Debtor's Reply, Rosa explains that the $25,000 donation is an investment whereby debtor is "collaborating on a research project to develop next-generation terrazzo materials. The project involves engineering students and faculty working closely with the Debtor to innovate improvements that would yield benefits to the Debtor, the university, and the Debtor's industry." Reply at 3–4.

On January 25, 2022, the Court held an evidentiary hearing on Rosa's Motion to Reject and heard evidence testimony from Rosa's principles Tatman and Cristofoli, as well as testimony from Rosa's CPA Christopher Ward, PNC employee Andrea Kinser, and Union employees Dustin Reinstedler and Tim Spaulding. Prior to the hearing, the Union filed [R. 139] objections to certain exhibits and witnesses seeking to exclude testimony from Christopher Ward and exclude the use of Rosa's Exhibit 3 (Rosa's financial projections without modifications to the CBA), Revised Exhibit 3 (updated financial projections without CBA modifications), and Exhibit 17 (projections without the CBA). Rosa meanwhile filed its own [R. 141] objection to the admissibility of the Union's Vesta Tile tax return exhibit. At the January 25, 2022 evidentiary hearing, the Court heard arguments on the parties' objections to witnesses and exhibits,

before granting Rosa's objection, excluding the Vesta Tile tax return evidence on relevancy grounds, Tr. 13:21–22, and overruling the Union's objections, allowing both the testimony of Rosa's CPA Christopher Ward, Tr. 18:17–23, and the admission of the financial projection exhibits, Tr. 25:13–15.

Rosa's Exhibits 3 and 17 detail updated financial projections, based on the most current Operating Report from December 2021. *See* [R. 137-3; R. 137-16]. These projections include what Rosa's financial future would look like under the current CBA versus under Rosa's proposed modifications, as well as Rosa's actual profit numbers from 2018 through 2021:

| Year | Profit Projection with CBA | Profit Projection with Proposed Modifications |
|------|---------------------------|-----------------------------------------------|
| 2018 | $1,649,194 | same |
| 2019 | $405,804 | same |
| 2020 | $300,793 | same |
| 2021 | ($705,693) | same |
| 2022 | ($393,144) | ($92,535) |
| 2023 | ($411,115) | ($18,122) |
| 2024 | ($184,346) | $18,314 |
| 2025 | ($202,369) | $112,178 |

*See* [R. 137-3; R. 137-16]. The projections show historical and expected costs, where labor costs and material costs are consistently a large portion of Rosa's overall costs. *See* [R. 137-3; R. 137-16]. These projections also include

projections of Rosa's percentage of work that is tile work, with and without the current CBA, also providing historical percentages from 2018 to 2021:

| Year | Percentage Tile Work with CBA | Percentage Tile Work with Proposed Modifications |
|------|-------------------------------|--------------------------------------------------|
| 2018 | 35.71% | same |
| 2019 | 23.02% | same |
| 2020 | 15.88% | same |
| 2021 | 7.51% | same |
| 2022 | 3.00% | 3.00% |
| 2023 | 1.39% | 15.88% |
| 2024 | 0.00% | 23.02% |
| 2025 | 0.00% | 35.71% |

*See* [R. 137-3; R. 137-16].

At the evidentiary hearing, the Court heard testimony from Tatman, who explained that Rosa accepted the current CBA because "[Rosa's principle's] advisors just said that . . . if [they] didn't go to contract, [they] would be accused of bargaining in bad faith, and so [they'd] be facing another lawsuit." Tr. 149:21–25. Further, if Rosa did not sign the CBA, the Union said they could call for a strike, where if the employees do not strike, they face a penalty of about $3,000 per person. Tr. 150:2–7. Tatman testified that a strike would have caused Rosa to suffer liquidated damages, especially because May through August is the "height of [Rosa's] busy season." Tr. 150:10–21.

Tatman confirmed that she handles the financial work of Rosa as one of her responsibilities as President, Tr. 144:12–145:1, and calculated the projections originally provided to the Union along with the proposals using

14

Rosa's operating reports from January 1, 2021 through August 31, 2021, Tr. 162:23–163:2. Tatman also verified that the updated projections provided with the Motion to Reject were based on Debtor's financial performance in September, October, and November. Tr. 173:7–175:12. Tatman stated that after closing out the purchases from May to August, the company's purchases experienced "an extremely high increase in resins" and "everything from craft paper to [their] metal strips." Tr. 173:21–25.

Tatman stated that the concept behind the projections is for Rosa to become more competitive in tile work, with a goal that by 2025, to have their tile and terrazzo work percentages similar to their percentages in 2018. Tr. 179:14–18. Tatman testified that Rosa has attempted to maintain its competitiveness in terrazzo work by expanding its geographic scope of work, stating that Rosa has expanded work by taking jobs in Nashville, Tennessee; Huntington, West Virginia; Middle Tennessee State University; and Vincennes University—all areas where Rosa historically does not perform work. Tr. 179:3–13.

Tatman met with Rosa's CPA, Chris Ward, to discuss the methodology of these updated projections. Tr. 176:12–177:16, 207:19–208:3. At trial, Ward confirmed that he has worked with Rosa for twenty-five years, Tr. 206:6–8, and is familiar with Rosa's financials and business model. Tr. 208:15–18. In reviewing Tatman's projections, Ward verified that the information in the financial statements and tax returns was correct. Tr. 208:7–12. Additionally, Ward testified that the projections were reliable based on Tatman's methodologies and assumptions. Tr. 210:4–9. Ward also testified that Rosa's finances were "trending downward for probably a few different reasons,"

including union-related expenses, increased nonunion competition, and the fact that Rosa must pay a higher wage rate per hour to their workers. Tr. 211:1–11.

The Court also heard testimony from Andrea Kinser, Rosa's former banker at PNC, who stated that the primary reason for terminating Rosa's line of credit was due to the downward trajectory of the financial performance of Rosa and each of its associated companies. Tr. 130:13–134:15, 139:21–24, 140:18–141:16.

The Court heard testimony from Cristofoli, part-owner of Rosa and the individual responsible for Rosa's field operations, Tr. 29:17–30:3, who estimated the wage range of thin-set tile work competing companies pay based on his experience in the field. Tr. 33:19–38:5. Cristofoli testified that he would discuss wages with employees from other companies while out on tile setting jobs to "understand[] where the market goes and where [Rosa] need[s] to be competitive." Tr. 34:8–35:10. Cristofoli also testified that he makes this type of inquiry at most jobs on which he is employed. Tr. 35:11–23. Based on these discussions, Cristofoli estimated that competing companies pay their employees between $20 to $25 an hour. Tr. 35:24–37:11. Dustin Reinstedler, representing the Union's Louisville Chapter, did not give an amount as to nonunion competitors wage rates. *See* Tr. 309:7–16. Instead, Reinstedler posited that "[t]he work's plentiful and people are making good money," Tr. 309:12, and stated that he had no experience working in the tile industry. Tr. 313:10–25.

At the end of trial, the Court heard from the subchapter V trustee, who stated she participated in the negotiations with the union and the October 1113 conference. Tr. 361:19–22, 363:1–3. The trustee found the bargaining session

16

"to be almost immediately caustic and hostile, at least from the union perspective" and that "[i]t was a challenge to get past even the first line of communication." Tr. 363:4–6. The subchapter V trustee also provided that "the biggest problem throughout the entire remainder of the negotiations" was the Union's "all-or-nothing" position on Vesta, allowing no middle ground with the debtor making a payment to settle the dispute. Tr. 364:1–9. Accordingly, the trustee recognized that there was no point in further negotiations. Tr. 354:18–25. Following the evidentiary hearing, the Court allowed the parties to file post-hearing briefs, *see* [R. 159] ("Union's Brief") and [R. 160] ("Rosa's Brief"), before taking the matter under advisement.

\* \* \* \* \*

## LEGAL STANDARD

The parties agree that Rosa's Motion to Reject is governed by 11 U.S.C. § 1113. Both parties also cite and rely upon *In re Kentucky Truck Sales*, a case in which the Bankruptcy Court for the Western District of Kentucky articulated the following nine requirements which must all be satisfied before a court can grant a motion to reject under § 1113:

1. The debtor-in-possession must make a proposal to the union to modify the collective bargaining agreement [1113(b)(1)(A)];

2. The debtor-in-possession must meet at reasonable times with the union prior to the date of the § 1113 hearing [1113(b)(2)];

3. At meetings with the union, the debtor must bargain in good faith with the union in attempting to reach mutually satisfactory modifications of the collective bargaining agreement [1113(b)(2)];

4. The proposals made by the debtor-in-possession must be based on the most complete and reliable information available at the time of the proposal [1113(b)(1)(A)];

17

5. The proposed modifications must be necessary for the reorganization of the debtor [1113(b)(1)(A)];

6. The proposed modifications must assure that all creditors, the debtor and all other affected parties are treated fairly and equally [1113(b)(1)(A)];

7. The debtor must provide to the union such relevant information as is necessary to evaluate the proposal [1113(b)(1)(B)];

8. The union must have refused to accept the debtor's proposal without good cause [1113(c)(2)]; and

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement [1113(c)(3)].

*In re Ky. Truck Sales, Inc.*, 52 B.R. 797, 800 (Bankr. W.D. Ky. 1985).  Rosa, as the moving party, bears the burden of persuasion on these issues by a preponderance of the evidence.  *Id.* at 800–01.  Once Rosa has established compliance with each of the nine requirements by prima facie evidence, however, the burden shifts to the Union to produce evidence "contradicting the debtor's compliance with one or more of these nine elements of section 1113." *Id.* at 801.

\* \* \* \* \*

## ARGUMENT

The first two requirements in the *Ky. Truck Sales* nine-requirement test are undisputedly met.  First, the Union does not dispute that Rosa made a proposal to the Union on October 8, 2021 which the Union rejected at the parties' settlement conference.  Second, the Union also does not dispute that Rosa met with the Union via a Zoom settlement conference on October 22, 2021, which the Subchapter V Trustee also attended.  Nor does the Union dispute that, following the Union's rejection of the proposal, on November 17, 2021, Rosa

offered to meet for a second settlement conference on either November 22 or 23, an offer the Union ultimately rejected, instead moving to dismiss the bankruptcy case. *See* Objection at 3–4; *see also* MTD. Accordingly, the first two of the nine requirements are satisfied: (1) Rosa made a proposal to the union to modify the CBA, and (2) Rosa proposed and held meetings at reasonable times with the Union prior to the § 1113 hearing on January 25, 2022. Where each of the remaining seven requirements are in dispute, *see* Objection at 3–4, the Court will address each requirement in turn below.

**A.    Rosa Bargained in Good Faith with the Union in Attempting to Reach Mutually Satisfactory Modifications of the CBA.**

Section 1113(b) requires that the debtor "confer in good faith in attempting to reach mutually satisfactory modifications" of the agreement.    11 U.S.C. § 1113(b)(2).[7]    The requirement is satisfied if debtor "seriously attempted to negotiate reasonable modifications in the existing collective bargaining agreement prior to the rejection hearing." *Ky. Truck Sales*, 52 B.R. at 801 (citing *In re Wheeling-Pittsburgh Steel Corp.*, 50 B.R. 969, 976 (Bankr. W.D. Pa. 1985)).

Good faith bargaining is "conduct indicating an honest purpose to arrive at an agreement as a result of the bargaining process." *In re Bowen Enters., Inc.* 196 B.R. 734, 744 (Bankr. W.D. Pa. 1996) (citing *Matter of Walway, Co.*, 69 B.R. 967, 973 (Bankr. E.D. Mich. 1987)).    Significant to good faith determinations is

---

[7] This "obligation to negotiate in good faith is imposed not only on the debtor but also on the union." *Matter of GCI, Inc.*, 131 B.R. 685, 692 (Bankr. N.D. Ind. 1991) (citing *In re Mile Hi Metal Sys., Inc.*, 899 F.2d 887, 892 (10th Cir. 1990)).    Therefore, the union must also participate meaningfully in the negotiations and explain its reasons for opposing the proposal. *Mile Hi Metal Sys. Inc.*, 899 F.2d at 892 (citing *Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d 82, 92 (2d Cir. 1987)).    However, since the union is also required to have good cause for its refusal to accept the debtor's proposal, its conduct during the negotiations is analyzed as part of the good cause determination. *GCI, Inc.*, 131 B.R. at 692 (citing *Mile Hi Metal Sys., Inc.*, 899 F.2d at 892).

19

where "debtor at all relevant times was ready, willing, and able to negotiate modifications to the existing collective bargaining agreement." *Bowen Enters., Inc.*, 196 B.R. at 745; *see In re Sol-Sieff Produce Co.*, 82 B.R. 787, 795 (Bankr. W.D. Pa. 1988). For example, in *Walway*, the court found good faith on behalf of the debtor where "[t]he Debtor met numerous times with the Union to engage in discussions" and "provided the Union with a comparative cost analysis to show the negative impact of the Union's proposal on the viability of the business." 69 B.R. at 973. Similarly, in *In re Salt Creek Freightways*, debtor's bargained in good faith where the "debtor met four times with the Union"; "debtor considered and analyzed each of the Union's counter-proposals and orally conveyed to the Union the figures supporting its contention that the Union's proposed reductions were insufficient to allow it to remain in business"; "debtor proposed an alternative insurance plan for the Union employees and offered to join the Union's proposed insurance plan if it could acquire the benefits for the same price"; "[a]t the debtor's request, a federal mediator was asked to mediate towards settlement at the last negotiating session"; and "debtor has placed its 'Last Best Offer' before the Union." 47 B.R. 835, 839 (Bankr. D. Wyo. 1985).

Here, Rosa submitted its proposals on October 8, 2021, and offered to continue negotiations after the Union rejected the proposals at the October 22, 2021, settlement conference. Similar to *Walway*, Rosa provided financial projections to illustrate the CBA's effect on the company's profits. At the request of the Union, Rosa provided its tax returns from the past five years, and Rosa also complied with Union's requests for more information. The Union requested and received from Debtor documents including "[e]vidence of payments to

20

insiders; [e]vidence of payments to management; [m]onthly balance sheets and income statements; 2019-2021 job costs on tile projects; [s]pecific information relevant to specific tile projects; [i]nsider loan documents and guarantees; [a] list of work under contract through September 2021; 2021 Anthem health care plan cost summary by category and coverage; Rosa's response to the apprenticeship Union audit; Additional Anthem health, vision, and dental plan information for 2021-2022; [a] list of Rosa's current field employees; and Union contribution reports. *See* [R. 110-2]. The Union does not dispute that Debtor has complied with the Union's document requests. And similarly to *Salt Creek Freightways*, 47 B.R. at 839, Rosa articulated to the Union that the November 24, 2021, and December 22, 2021, counterproposals were not feasible.

The Union claims that Rosa did not meets its obligation to bargain in good faith for several reasons: (1) Rosa "negotiated a new CBA effective two months prior to the bankruptcy"; (2) "the proposals themselves demonstrate bad faith"; and (3) the "response to the Union's counterproposals make clear that Rosa has no intention to bargain modifications to the CBA truly necessary to allow a successful reorganization." Objection at 4; Union's Brief at 3.

1. *Rosa Negotiated a New CBA Effective Two Months Prior to the Bankruptcy.*

First, this Court recognizes that Rosa's financial situation has significantly worsened in the last few years and has rapidly declined even more so since its first proposal, discussed in more detail below in Sections B and C. The Union's claim that "Rosa failed to produce any evidence demonstrating a change in its financial status over the two-month period between its execution of the CBA and

its filing for bankruptcy protection" as well as "the post-petition through date,"
Objection at 4, is simply not true.   Rosa provided yearly financial projections
through FY 2025 to the Union with its first proposal, the cost profiles of which
show the downward trend in Rosa's annual profits, ultimately leading to
significant losses if the current CBA is maintained.   Rosa's Proposals at 4–5.
Rosa has further provided the Union with its monthly Operating Reports from
August 2021 through December 2021, as well as tax returns filed by Rosa since
2015.   Not only did these documents provide the Union with information of
Rosa's rapidly changing financial condition, they also demonstrate the Debtor's
need to renegotiate the CBA.   Even though the parties entered into the CBA two
months prior to the Petition Date, Rosa's recent financial information indicates
the current CBA is unfeasible.

### 2. Rosa's Proposals

The Union also claims bad faith bargaining as to each of Rosa's proposals.
These include Rosa's proposals regarding wages; health insurance and pension;
the Market Recovery Program; the Apprenticeship Program; and the Vesta
Litigation.   We address each of these in turn.

As to Rosa's proposal regarding wages, the modification calls for a "lower
pay schedule for Commercial tile setter and Commercial tile finishers," setting
the minimum hourly base pay to $18.00 per hour for Commercial tile setters and
$15.00 per hour for Commercial tile finishers.   Rosa's Proposals at 1.   The
previous base wage rate was $25.78 per hour for setters and $17.44 per hour for
finishers.   *See* Current CBA at 22–23.   The Union contends that "Rosa never
provided any documentation to support this steep reduction in wages."   Union's

Brief at 3. The Union also posits various reasons for why Rosa should still be able to pay the current wage rates and that labor costs do not represent a disproportionate share of total expenses. These include: "Rosa insiders are exorbitantly compensated"; "Rosa has not placed a bid for thinset tile work in five or six years [and] Rosa insiders created a second company Vesta Tile and Stone ("Vesta") that performs thinset tile work"; "Rosa is able to consistently get jobs and be profitable without thinset work"; "Rosa performs work in Eastern Kentucky and pays $4-5 an hour higher than the CBA at issue." *Id.* at 3–4. It is true that Rosa needs to provide some basis for its proposals. *See In re United States Truck Co. Holdings*, No. 99-59972-WS, 2000 WL 1580098, at *20 (Bankr. E.D. Mich. Oct. 2, 2000) ("without knowing the basis for Debtor's proposals, the parties could not have meaningful discussions"). But as already mentioned, Rosa provided the Union with financial projections to support the proposal, which include labor costs and wages. Whether Rosa is actually able to pay the current wage rates is analyzed under whether the modifications are necessary to reorganization—not if the proposals were made in bad faith. The Court will address this issue herein below.

The next proposal involved switching the Union employees who are Commercial tile setters and finishers to a private health insurance, where Debtor would pay 80% toward an individual or family health plan. Rosa's Proposals at 2. Meanwhile, the Union employees who are traditional tile setters and finishers would retain the same union benefits as under the original CBA. *Id.* These Union employees would also be covered by a separate 401(k) matching plan instead of a pension plan. *Id.* The Union argues that the health insurance

proposal does not necessarily save costs compared to the current one, and that the switch from a pension plan to a 401(k) plan provides no cost savings. Objection at 7–8; Union's Brief at 4. Rosa has provided cost profiles comparing the financial projections of Rosa's net profits under the current CBA and the financial projections if Rosa's modifications were to be accepted. The projections include health benefits costs. Again, whether these modifications save money or not goes to the "necessary to reorganization" determination, not to bad faith. It is enough that Rosa has provided a basis for its proposal.

Rosa's third proposal is to eliminate the Market Recovery Program. The Union states that this proposal does not save money and there is no evidence demonstrating that elimination of the program is necessary to reorganization. Union's Brief at 5. The Union conflates good faith with the "necessary to reorganization" determination, and the Court will consider the Market Recovery Program's cost savings herein below.

The fourth proposal involves providing the Apprenticeship Program in Louisville. Rosa's Proposals at 2. The Union states that Rosa had previously advocated for eliminating the apprenticeship program when negotiating the current CBA and their current proposal is contrary to their prior position, and this lack of consistency demonstrates bad faith. Objection at 7–8; Union's Brief at 5. However, Rosa did not opt out of the apprenticeship program and is now demanding to get back in, as the Union seems to assert. Tr. 101:9–22. Rather, Rosa is attempting to negotiate a more feasible option for its employees since it is unable to eliminate the program. This is not an inconsistent position, but instead indicates that Rosa feels the need to negotiate the program for

reorganization and is providing another option since the Union would not agree to elimination previously.

The fifth proposal calls for the "litigation against Vesta Tile and Stone to be dismissed under the condition that all Vesta workers would be provided the opportunity to vote on whether to unionize" where "the Union and Debtor would accept the vote of the Vesta employees and move forward." Rosa's Proposals at 2. The Union argues that the Vesta litigation does not involve a modification to the CBA and therefore is outside the scope of Section 1113. Union's Brief at 5. The Union also asserts that "the claim against Rosa for contributions owed in the alter-ego litigation should be addressed in the plan for reorganization and not a Section 1113 motion." *Id.* However, the Union would not settle with Rosa until Rosa required Vesta to join the Union, Tr. 166:22–167:5, and the Union's counterproposal required those very terms. *See* [R. 137-2]. On this issue, it is the Union, not Rosa, that is advancing an inconsistent, contradictory position. The Union claims that Vesta is not a proper subject of the CBA, but simultaneously also requires a proposal involving Vesta. This does not seem to indicate bad faith on Rosa's part, but rather a negotiation that had come to an impasse. "[F]ailure to reach agreement appears to be the result of the difficultness of the task, rather than the lack of 'good faith' of either party." *See Salt Creek Freightways*, 47 B.R. at 839–40 (no finding of bad faith where the debtor would "not agree to either a pay-back of its delinquent pension trust obligation or a continuation of those obligations, while the Union [would] not agree to a contract that does not satisfy these same obligations").

25

While there may be disputes as to how much money each of these proposals actually save, mere disagreement between the parties does not compel a finding of bad faith. *In re S.A. Mech., Inc.*, 51 B.R. 130, 132 (Bankr. D. Ariz. 1985) (citing *Salt Creek Freightways*, 47 B.R. at 839–40). This is not a case where Rosa made proposals with conditions that cannot be fulfilled. *See In re Unites States Truck Co. Holdings*, 2000 WL 1580098 (court found bad faith where debtor imposed unrealistic time frames and bargaining conditions). Instead, Rosa has "at all relevant times was ready, willing, and able to negotiate modifications to the existing collective bargaining agreement." *In re Bowen Enters., Inc.* 196 B.R. at 745. Rosa sent its proposal to the Union and offered to renegotiate after the Union rejected it after the first settlement conference. Where the Union claims that the proposals regarding wages and the switch to the 401(k) have no basis for support, Rosa did provide the Union with future projections, the cost profiles of which included wages and health insurance. It is unconvincing to state that proposals involving these very topics have no basis when each is specifically identified in a document provided to the Union. The proposals themselves do not demonstrate bad faith.

### 3. The Union's Counterproposals

Further, the Union asserts that evidence of Rosa's bad faith in negotiations is contained in Rosa's response to the Union's counterproposals. On November 24, 2021, the Union proposed that Rosa resume contributions to the Louisville Pension Fund and the IPF. [R. 126-14 at 1–3]. Rosa has stated that they made a business judgment that incurring the withdrawal liability of more than $700,000 was better than to continue participating in a "massively underfunded

pension and continuing to bear the ongoing burden of the Debtor's proportionate share of the unfunded liability, particularly when the Debtor had no say over the management of the funds while they performed abysmally during the most favorable investment environment in the history of the markets." Reply at 6–7. Regardless of whether Debtor contributes to the pension fund, that withdrawal liability is still on their books. Tr. 63:16–25. For example, if Rosa were to sell their business, the withdrawal liability would be included in the cost. Tr. 116:17–25. Rosa stated it is their preference to incur the withdrawal liability now instead of allowing it to increase and become more of a burden, as it has in the last few years. Reply at 6–7.

On December 22, 2021, the Union submitted to Rosa another counterproposal that added two additional items. The first is that the Union would "forego any claim against Rosa in the alter ego case for the period subsumed in the pending lawsuit and for the period subsequent to the audit period covered in the pending lawsuit in exchange for Vesta signing a CBA now or Rosa resuming all work performed by Vesta." [R. 137-2 at 1]. As mentioned above, the Union attempts to state that Vesta is outside the scope of the CBA, but here is using Vesta as a bargaining tool in negotiating the CBA. It is outside the jurisdiction of this court to rule on whether Vesta is an alter ego of Rosa. Based on the evidence in the record, it is unclear whether Rosa has the authority to transfer Vesta's contracts to Rosa or to require Vesta's workers to join the Union. From Rosa's perspective[8], this is not a usable bargaining tool.

---

[8] Rosa claims it has no authority to settle on behalf of Vesta. Motion to Reject at 8.

The last counterproposal stated that "[t]he Union [would] forego the June 2022 wage increase mandated by the current CBA." *Id.* The Union states that this last proposal, in the aggregate with the other two proposals would save Rosa $1,921,037, and Rosa's refusal to consider saving that amount of money illustrates that Rosa is negotiating in bad faith. Objection at 10. Rosa has provided answers detailing its reasons for rejecting the counterproposals, particularly as to the Union's counterproposal concerning Vesta. The Union would not agree to Rosa's proposal that Vesta employees vote to unionize because the Union felt it had a strong case in the Vesta litigation. Tr. at 305:25–306:4. Refusing a counterproposal is not considered bad faith, and instead this is a disagreement and impasse between the parties.

Similar to *Walway*, Rosa has attempted to meet with the Union for further negotiations after the initial settlement conference and has provided to the Union a cost analysis showing the negative impact of the current CBA on the viability of business. There is clearly disagreement among the parties as to how much the proposals are saving and what the modifications should be, but disagreement does not compel a finding of bad faith. Because Rosa was available and willing to meet with the Union for negotiations and provided a basis for their modifications, Rosa has met its obligation to negotiate in good faith.

**B.    Rosa's Proposals Were Based on the Most Complete and Reliable Information Available at the Time of the Proposal.**

Debtor's Section 1113(b) proposal must be "based on the most complete and reliable information available at the time of such proposal." 11 U.S.C. § 1113(b)(1)(A). Rosa's Proposals were based on profit projections prepared by

Tatman. Tatman handles the financial work of Rosa as one of her responsibilities as President. Tr. 144:12–14. The projections were calculated using Rosa's operating reports from January 1, 2021, through August 31, 2021. Tr. 162:23–163:2; Reply at 4.

The Union argues that "Rosa's proposals were based on speculative future losses and biased input from [Tatman]." Objection at 10. The Union goes further to state that Tatman is not qualified as an expert and since she is Rosa's President, there is doubt as to the objectiveness of the projections. *Id.* The Union cites to *Ky. Sales* to point out that the debtor in that case hired an independent expert to support its bargaining proposals. *Id.* The Union also uses *Ky. Sales* to show that the debtors in that case "lost $100,000.00 in the two fiscal years preceding the bankruptcy, and had lost $60,000.00 in the subsequent fiscal year" and that "[t]he changes proposed by the debtor were accordingly targeted at reducing operating expenses by $100,000 per year." *Id.* at 10–11. The Union compares the situation in *Ky. Sales* to the one in this case, where "Rosa has not shown any losses." *Id.* at 11. The Union points to Rosa's Tax Returns, "which show consistent profitability, cast[ing] further doubt on to the reliability of the Debtor's projections." *Id.*

Section 1113(b) does not require an expert to compute financial projections. *See Ky. Truck Sales,* 52 B.R. 797; *cf. Walway*, 69 B.R. 967 (information used and analyzed by President of debtor company was accurate and current to provide to the Union). Instead, "[t]he debtor is simply required to gather the most complete information available at the time and to base its proposals on the information it considers reliable." *In re 710 Long Ridge Rd.*

*Operating Co., II, LLC*, 518 B.R. 810, 833 (Bankr. D.N.J. 2014). Further, "[s]ection 1113 proposals do not need to be perfect, but the debtor must make 'an honest effort to compile all data relevant to making its proposal.'" *Id.* (quoting *Ass'n of Flight Attendants-CWA, AFL-CIO v. Mesaba Aviation, Inc.*, 350 B.R. 435, 454 (D. Minn. 2006)).

Rosa's projections were originally produced in October and Rosa provided updated projections in December, where the original projections showed financial loss beginning in 2023, and the updated ones showed a loss starting in 2021. *See* Rosa's Proposals at 4–5; [R. 110-3; R. 110-4]. The Union argues that Rosa's "disparate submissions to the Union and to the Court obliterate its credibility" and are "not based on reliable information." Objection at 12. However, Debtor explained in its Reply and at trial that the projections were updated to include Debtor's financial performance in September, October, and November. Reply at 4; Tr. 173:7–175:12. This included the results from two significant jobs that were underway in the Fall of 2020. Reply at 4; Tr. 174:10–175:3. Additionally, Debtor specified that the original projections estimated Rosa's cost of materials based on the ratio of materials cost to total billings that Debtor experienced in 2020. Reply at 4. However, Tatman stated at trial that after closing out the purchases from May to August, there the company's purchases experienced "an extremely high increase in resins" and "everything from craft paper to [their] metal strips." Tr. 173:21–25. This meant that Debtor was experiencing materials cost increases from 7% to 15% resulting in additional costs of nearly $400,000, which put Debtor over the line into financial loss. Reply at 4–5.

Further, Tatman met with Rosa's CPA, Chris Ward, to discuss the methodology of these updated projections. Tr. 176:12–177:16, 207:19–208:3. In reviewing Tatman's projections, Ward verified that the information in the financial statements and tax returns was correct. Tr. 208:7–12. Ward testified that the projections were reliable based on Tatman's methodologies and assumptions. Tr. 210:4–9. Nonetheless, the updated projections did not alter the original proposal. If anything, the updated projections emphasize that Rosa continues to provide the most current information it possesses and is updating for accuracy. This does not take away from the fact that Rosa relied on its most current information, the Operating Reports from January through August of 2021, at the time of the proposal, provided in October.

The projections comport with Rosa's Tax Returns. Debtor provided to the Union its tax returns from 2015 through 2020. According to these documents, there is a significant downward trend in Rosa's Ordinary Business Income starting in 2017: $2,218,942 for 2017; $1,634,542 for 2018; $593,433 for 2019; and $583,090 for 2020. *See* Rosa's Tax Returns. Despite the Union's claim that Rosa is still profitable, Rosa is experiencing substantial revenue loss. Indeed, the Union points out that Rosa's November 2021 Operating Report reflected a profit of $234,790. Objection at 14. By the time of the January evidentiary hearing, Rosa filed its December 2021 Operating Report, revealing a loss of $643,779. *See* [R. 137-15 at 14]. Profit or loss, Debtor need not show current losses to justify its Motion to Reject. Here, Debtor's projections reflect its reality: Rosa's Tax Returns and Operating Reports show a downward financial trend, and the projections indicating future loss (whether original or updated) have

31

already started.   This proves that the information Debtor relied on for its proposals was indeed reliable.[9]

The Union also argues that Rosa's "assertion that the Union wage and fringe benefit package is 18–20% higher than non-union market rates" is unsupported by evidence and therefore "incomplete and unreliable."   Objection at 13; *see* Union's Brief at 6.   However, Cristofoli, part-owner of Rosa and responsible for Rosa's field operations, Tr. 29:17–30:3, estimated the wage range of thin-set tile work competing companies pay based on his experience in the field.   Tr. 33:19–38:5.   Cristofoli testified that he would discuss wages with employees from other companies while out on tile setting jobs to "understand[] where the market goes and where [Rosa] need[s] to be competitive."   Tr. 34:8–35:10.   Cristofoli also stated that he attempted to gather information on this issue at each job site where he worked.   Tr. 35:11–23.   Based on these discussions, Cristofoli estimated that competing companies pay their employees between $20 to $25 an hour.   Tr. 35:24–37:11.   Where Rosa is obligated to pay its tile setters a minimum of $32.40 an hour and its tile finishers $23.67 an hour under the current CBA, *see* Current CBA at 22–23, the 18-20% estimate is accurate based on relevant information possessed by Rosa.   Notably, the Union is unable to contest these numbers.   At trial, Dustin Reinstedler, representing the Union's Louisville Chapter, did not testify to an amount as to nonunion competitors wage rates.   *See* Tr. 309:7–16.   Instead, Reinstedler only posited that

---

[9] The Court notes that Tatman's projections are supported by PNC's assessment that Rosa has been experiencing a generalized decline in the financial performance of its main business and those of its associated entities.   Tr. 130:13–134:15,  139:21–24, 140:18–141:16.

"[t]he work's plentiful and people are making good money," Tr. 309:12, before admitting he had no experience working in the tile industry.  Tr. 313:21–23.

Debtor has proved that it based its projections and estimates on reliable information and has met its burden to compile complete information and relevant data.  By all accounts, Debtor's proposal was based on the most complete and reliable information available at the time of the proposal.

## C.    Rosa's Proposed Modifications Are Necessary for Reorganization.

This requirement is satisfied when the proposal "contains necessary, although not absolutely minimal, changes that will enable the debtor to complete the reorganization process successfully."[10]    *Truck Drivers Local 807, Int'l Brotherhood of Teamsters v. Carey Transp., Inc.*, 816 F.2d 82, 90 (2d Cir. 1987). This standard "prevent[s] the debtor from quickly falling into liquidation or another Chapter 11 proceeding by ensuring that it can compete following its reorganization."  *Mesaba Aviation*, 350 B.R. at 449.  However, debtor's proposals "must be more than potentially helpful; they must be directly related to the

---

[10] There is a circuit split as to the meaning of the section 1113(b) requirement that the proposed changes be "necessary to permit the reorganization of the debtor."  The Second Circuit uses a flexible definition of the word "necessary," where the standard is whether modifications "would increase the likelihood of successful reorganization."  *Truck Drivers Local 807, Int'l Bhd. of Teamsters v. Carey Transp., Inc.*, 816 F.2d 82, 89 (2d Cir. 1987). The Third Circuit takes a more restrictive view, requiring that proposed modifications be "essential" to prevent liquidation in the short term.  *Wheeling–Pittsburgh Steel Co. v. United Steelworkers of Am., AFL–CIO–CLC*, 791 F.2d 1074 (3d Cir. 1986).  The Tenth Circuit observed that the "majority of cases decided since *Wheeling-Pittsburgh* have declined to interpret section 1113(b)(1)(A) as requiring that a proposal be absolutely necessary."  *In re Mile Hi Metal Sys.,* Inc, 899 F.2d 887, 892 (10th Cir. 1990) (citations omitted).  Indeed, district courts within the Sixth Circuit that have considered the issue have adopted the Second Circuit broader definition of "necessary," including the District Court for the Eastern District of Kentucky.  *See In re Sun Glo Coal Co., Inc.*, 144 B.R. 58 (Bankr. E.D. Ky. 1992); *see also In re Amherst Sparkle Mkt., Inc.*, 75 B.R. 847 (Bankr. N.D. Ohio 1987); *In re Ormet Corp.*, 355 B.R. 37 (S.D. Ohio 2006); *Matter of Walway Co.*, 69 B.R. 967 (Bankr. E.D. Mich. 1987).  Here, the parties do not dispute the definition of the term "necessary."  This Court agrees with the reasoning in *Carey* that the section 1113(b) "necessary" language employs a broader definition and join our sister district court in adopting the Second Circuit's flexible standard.

debtor's financial condition." *Mile Hi Metal Sys., Inc.*, 899 F.2d at 893. "[I]n virtually every case, it becomes impossible to weigh necessity as to reorganization without looking into the debtor's ultimate future and estimating what the debtor needs to attain financial health." *Carey*, 816 F.2d at 89.

In this case, Rosa has provided future projections for each year through FY 2025. These projections are alternates and include both estimates of the financial state of the company under the current CBA versus under a CBA with Rosa's proposed modifications. Reproduced below are the profit numbers provided in Rosa's projections showing the profit comparisons:

| Year | Current CBA Profit Projection | Modified CBA Profit Projection |
|---|---|---|
| 2022 | ($393,144) | ($92,535) |
| 2023 | ($411,115) | ($18,122) |
| 2024 | ($184,346) | $18,314 |
| 2025 | ($202,369) | $112,178 |

*See* [R. 137-3; R. 137-16]. As shown, Rosa estimates it will sustain significant losses each year under the current CBA. If Rosa's Proposals are accepted, it is estimated that Rosa will sustain losses in 2022 and 2023, with gradual improvement until the company is profitable again in 2024 and 2025. At trial, Tatman stated that the concept behind the projections is for Rosa to become more competitive in tile work, with a goal that by 2025, Rosa's tile and terrazzo work percentages will be similar to the percentages seen in 2018. Tr. 179:14–18. In 2018, Rosa's tile work consisted of 35.71% of their jobs, where in 2021, tile work was only 7.51% of their total job. *See* [R. 137-3; R. 137-16]. Given the trend in the tile and terrazzo installation industry toward client projects

preferring "thin-set" tile installation over "mud-set" tile or terrazzo, *see* Motion to Reject at 1–2, Rosa's desire to increase its amount of tile work is reasonable.

Rosa claims it is competing against at least twenty-nine nonunion tile and terrazzo contractors in the region. Motion to Reject at 10. Rosa presented a list of projects it considered bidding on in 2020 and 2021 before deciding it could not be competitive due to nonunion bidders. *See* [R. 137-7]. Rosa also provided a list of projects it did bid on in 2020 and 2021 but was rejected in favor of a nonunion competitor. *See* [R. 137-8]. This totals ninety-two projects and showcases the potential amount of work Rosa seeks to become more competitive. Knowing Rosa's projected financial future and goals for reorganization, the Court now turns to Rosa's proposals.

### 1. Rosa's Proposed Modifications

Rosa claims its proposals will help it bid more successfully for thin-set tile projects through reduction of labor costs. Tr. 164:2–20. Under the Current CBA, tile setters are paid a base pay of $32.40 an hour and tile finishers have a base pay of $23.67 an hour. *See* Current CBA at 22–23. These rates are paid regardless of the type of work the employee performs—commercial (thin-set) or traditional (mud-set and terrazzo)—even though traditional tile setters and finishers require more skill and training. Rosa's first proposal allows for a lower pay schedule for commercial tile setters and commercial tile finishers, creating a category of employees who perform thin-set tile work. According to Rosa, nonunion competing companies pay between $22 and $30 per hour for tile installers and between $15 and $18 per hour for tile finishers. Motion to Reject at 10. Rosa's Proposals call for a base pay of $18 per hour for commercial tile

setters and $15 per hour for commercial tile finishers, while keeping the current CBA base pay rates for traditional tile, marble, and terrazzo setters and finishers. By lowering the pay schedules and thereby reducing labor costs for thin-set tile work, Rosa claims it will be able to more successfully bid for thin-set tile projects.

The Union argues that Rosa's Proposals are inconsistent because Rosa claims that it currently pays wages 18-20% higher than nonunion competitors, but seeks to lower wages more than 18-20%. Objection at 5–6. However, Rosa's stated goal is to become competitive in thin-set tile work. It makes sense that Rosa would provide a lower labor cost than its competitors in order to win bids. Additionally, the Union did not provide counter wage rates for nonunion competitors. In fact, the Union provided no valid evidence on the wage rates of nonunion thin-set tile setters.

Rosa's second proposal creates a separate health insurance plan as well as coverage by a separate 401(k) matching plan for thin-set setters and finishers. This is related to labor costs because under the Union insurance plan, the insurance is funded by employer contributions submitted for each hour of work performed by employees, of which Rosa pays $5.25 an hour under the current CBA. With the proposed health care plan, Rosa would pay 80% toward an individual or family health plan. Tatman testified that Rosa could provide its proposed insurance plan at about half the cost of the Union's insurance plan. Tr. 156:23–157:8. She further stated that employees had struggled to get medical costs covered by the union insurance plan, and this new insurance plan would provide easier access for employees to their medical benefits. Tr. 185:18–186:15. Tatman also testified that the 401(k) plan would be beneficial over the

36

Union's pension plan because it is transportable, whereas the Union pension plan is not. Tr. 158:1–19. As a package, Rosa's health insurance and 401(k) proposal would deliver cost savings and provides some advantages over what the Union currently offers.

The Union argues that Rosa's health insurance plan could cost the company more depending on the composition of its workforce. For example, if an employee selects family coverage, Rosa would pay $1,247.11 in monthly premiums where Rosa currently pays about $840 in monthly contributions under the Union's health plan for the same family coverage. Objection at 6; Union's Brief at 4. Despite this, the Union provides no evidence of what the ultimate cost of Rosa's insurance plan is and provides no numbers to refute Rosa's projected costs.

Rosa's third proposal is to eliminate the Market Recovery Program. The CBA requires the Debtor to deduct from its employees' wages to fund the Union's Market Recovery Program, which is intended to subsidize Union contractors' bids to improve their competitiveness against non-Union contractors. Tr. 89:17–20. Rosa claims it receives no benefit from contributing to this program as it has not received a subsidy from the program in many years, despite applying. In fact, in at least one instance the Union awarded a subsidy to one of Rosa's competitors, Midwest Terrazzo, in which the application listed Rosa as a nonunion competitor. Tr. 319:19–322:18; *see* [R. 131-38]. The Union states that this proposal does not save money and there is no evidence as to why eliminating the program is necessary to reorganization. Rosa's proposal specifically states that the elimination of this program would "allow the Debtor's employees to retain the 1%

37

of wages contributed to this program." Rosa's Proposals at 2. Reallocating money is certainly a method of saving money, and as Rosa points out, "every dollar the Debtor pays in compensation that is diverted to the union's program is a dollar that could have been repurposed—for actual compensation paid to employees, for materials and other costs, for more competitive prices, whatever." Reply at 8.

Rosa's fourth proposal is for the Union to establish an apprenticeship program in Louisville or, in the alternative, for the Union to pay for Rosa's training program in Louisville. Rosa claims it receives no benefit from this program. Reply at 8. The Union's apprenticeship program is currently located in Indianapolis, and entry-level employees of Rosa are unwilling to make the five-hour round trip for uncompensated Saturday trainings. Rosa's Brief at 6; Tr. 46:5–12. The Union is supposed to recruit employees for Rosa, and Cristofoli explained that he's "been calling for finishers and mechanics for a year, and [has not] gotten anybody other than some bricklayers and hod carriers . . . which don't really cross over into [the tile industry]." Tr. 47:23–48:2. Rather, Rosa hires their employees and train them in-house. Tr. 46:13–18. The Union asserts that Rosa sought to eliminate the apprenticeship program while negotiating the current CBA and is now proposing the program be established in Louisville. The Union argues that "Rosa's business objectives have taken the form of a moving target, rendering it unclear what its true position is regarding the bona fide requirements necessary for a successful reorganization." Objection at 8. However, Rosa's attempt to provide another option since the Union would not agree to the program elimination underscores Rosa's position that negotiating

38

the apprenticeship program is necessary for reorganization. Further, the Union does not dispute that providing a program in Louisville or that funding Rosa's training program would save Rosa money.

Rosa's last proposal entails the Union dismissing the litigation against Vesta under the condition that all Vesta workers be provided an opportunity to vote on whether to unionize, where the Union and Debtor would accept the vote of the Union employees. The Union argues that because Rosa claims to not have authority to settle on behalf of Vesta, Rosa cannot have authority to propose this modification. Objection at 9. However, Debtor is not suggesting that Rosa would settle the Vesta Litigation, but rather, that the Union settle with Vesta. Rosa has incurred more than $310,000 in litigation costs thus far defending itself in the Vesta litigation, so there are obvious cost savings if the Union were to dismiss the case. The Union does not dispute that a dismissal of the Vesta litigation would save Rosa money.

### 2. Union Counterpoints

The Union's counterpoints can be distilled into four main arguments: rejection of the CBA is not necessary because (a) Rosa is a profitable entity, (b) Rosa is able to bid jobs, (c) Rosa performs work in other jurisdictions without seeking CBA modification; and (d) labor costs are not a disproportionate share of total expenses. We address each of these in turn.

### a. Rosa's Financial Status

The Union argues that reorganization is not necessary because Rosa is historically profitable. To support this, the Union points to the profit numbers indicated in Rosa's Tax Returns and operating reports. However, as discussed

above, Rosa is experiencing a significant financial downward trend that started in 2017. In 2017, Rosa's Ordinary Business Income was $2,218,942, and this number has decreased year by year now showing an Ordinary Business Income of $583,090 for 2020. *See* Rosa's Tax Returns. A debtor need not experience financial loss to prove that reorganization is necessary. "The fundamental purpose of reorganization is to *prevent* a debtor from going into liquidation." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) (emphasis added) (citing H.R. Rep. No. 95-595, p. 220 (1977)). Even so, Rosa *is* currently experiencing financial loss—Rosa's December Operating Report shows a loss of $643,779. *See* [R. 137-15 at 14]. At the time of the proposal provided to the Union in October, Rosa based its projections on its August Operating Report, which reflected the earned profit from January 2021 through August 2021 of $301,460. *See* August 2021 Operating Report. The continued downward financial trend was prevalent at the time of Rosa's Proposals, considering Rosa's profits in August reflected almost half of what it was in 2020.

The Union continues this argument by looking to Rosa's cash assets, stating that "Rosa has maintained a consistent cash flow that demonstrates no financial instability or concern." Objection at 15. According to Rosa's December 2021 Operating Report, Rosa had $452,790 in cash assets. *See* [R. 137-15 at 2]. The Union claims that with such money, Rosa can pay its claims without making any changes. However, Rosa has countered that it needs to have $500,000 cash-on-hand because PNC required Rosa to close its line of credit in September 2020. Tatman Affidavit at 7–8; Tr. 129:23-130:11. Andrea Kinser, Rosa's former banker at PNC, testified that primary reason for not renewing its

line of credit was because of Rosa's downward trending financial performance. Tr. 130:13–134:15, 139:21–24, 140:18–141:16.

The Union further argues that Rosa is "so flush with cash" that Rosa was able to make a $25,000 donation to the University of Louisville Research Foundation within 90 days preceding the bankruptcy. Objection at 2, 14, 19. Rosa states that this donation is an investment whereby debtor is "collaborating on a research project to develop next-generation terrazzo materials. The project involves engineering students and faculty working closely with the Debtor to innovate improvements that would yield benefits to the Debtor, the university, and the Debtor's industry." Reply at 3–4. This investment is in line with Debtor's financial interests, and this Court is unconvinced that such a relatively small donation supports the Union's claim.

The Union finishes its profitability argument by stating that Rosa is profitable without bidding on thin-set tile work. Objection at 15–16. The Union acknowledges that "Rosa has not placed a bid for thin-set tile work in five or six years." *Id.* at 16. However, it is apparent that the Union ignores Rosa's financial situation. As stated previously, Rosa's financial performance has been trending downward since 2017, to a point where Rosa was not able to renew a line of credit. The "Bankruptcy Court must consider the likelihood and consequences of liquidation for debtor absent rejection [of the labor contract]", *Bildisco* at 527, and here it is almost inevitable that Rosa is heading toward liquidation, which would result in the closure of its business and termination of its current employees. Rosa's goal to become more competitive in thin-set tile work would certainly help its financial status and aligns with the purpose of reorganization.

41

### b. *Rosa's Ability to Bid Jobs*

The Union asserts that the projects Rosa alleges it failed to secure "does not necessarily indicate that modifications – or outright rejection – of the CBA are necessary if Rosa continues to successfully bid on contracts for other jobs." Objection at 18–19. To support this, the Union states that the thirty-seven jobs Rosa did not bid on because it determined that it could not place a competitive bid may have been bid by Vesta. *Id.* at 18. The Union points out that Tatman testified that that the operations managers of Vesta and Rosa coordinate to determine whether Rosa or Vesta will submit a bid for a potential contract. *Id.* However, the Union provides no evidence that Vesta did bid on these projects and even if Vesta did, that does not address the fact that Rosa needs to become more competitive in order to even bid on the thin-tile projects.

The Union further states that the fifty-five projects Rosa did bid on and lost does not represent an increase in rejected bids over previous years, and that Cristofoli admitted it is not unusual for Rosa to not be awarded a majority of jobs. Objection at 18; Union's Brief at 7–8. Though Rosa historically only obtains "between 5% to 10% of the jobs it bids," Tr. 106:17–19, this does not mean that Rosa cannot attempt to raise those numbers by becoming more competitive in thin-set tile work. Noting Rosa's financial downward trend, Debtor is unable to rely on its historical percentages of bidding thin-set tile work, and the rejected projects offered by Rosa show that there is potential to increase the amount of work they currently perform.

### c. *Rosa's Work in Other Jurisdictions*

The Union argues that modifying this CBA is not necessary because Rosa performs work in other jurisdictions under collective bargaining agreements without seeking modification. Objection at 16; Union's Brief at 8. For example, Rosa performs work with local unions in Cincinnati, Ohio under CBAs which require payment of higher hourly wages and fringe benefits than Rosa's CBA at issue herein. Objection at 16; Union's Brief at 8. The Union argues that because Rosa has not sought modification with the Ohio Chapter CBA, Rosa is able to pay higher wages and benefits and therefore no reduction to wages is needed here. Union's Brief at 8. The Court is unpersuaded by this argument. The mere fact that hypothetical modifications could have been made to other CBAs, that have not even been submitted to the Court, does not outweigh Rosa's need to make modifications to the CBA before this Court. Moreover, the Union did not provide evidence that the wage disparities between union and non-union work are the same in both geographic areas. Thus, the possibility remains that the changes Rosa seeks to make to its main business in its home geographical area are necessary and reasonable.

### d. Labor Costs not Disproportionate Share of Total Expenses

The Union's final counterpoint is that Rosa's labor costs are not a disproportionate share of the total expenses. Union's Brief at 8–9. The Union states that Rosa's material costs started to increase in 2021 and have steadily increased since, where Rosa's labor costs have decreased. *Id.* at 9. The Union argues that Rosa has not attempted to lower material costs by asking for a reduction in amount owed to suppliers. *Id.*

43

The Union ignores that Rosa *has* attempted to reduce costs elsewhere. In the Motion to Reject CBA, Rosa lists six ways where it first reduced costs: (1) Tatman and Cristofoli did not receive W-2 income for October through December 2020 or for January, February, and July through September 2021; (2) Rosa terminated its contract with its business development contractor to save on the monthly retainer and expenses, averaging $2,000 per month; (3) Rosa introduced a high-deductible health benefits plan and health savings account to minimize health insurance costs, saving 10% of health benefits costs; (4) Rosa outsourced its payroll function in July 2020 when its payroll administrator retired, saving $11,380.00 per year; (5) Rosa did not replace its project manager when he left for another opportunity in January of 2021; (6) Rosa took certain actions, in conjunction with its bank and bonding company, to reduce annual accounting fees by 10%. Motion to Reject at 11.

The Union states that Tatman and Cristofoli received similar compensation packages in 2019 and 2020, so Rosa's two owners took home substantial compensation despite claiming not receiving W-2 income for parts of 2020 and 2021. For example, Tatman received compensation of $91,103.90 in income and $297,376 in K-1 income in 2020, similar to her compensation in 2019 with $106,342.76 in income and $302,651 of K-1 income. Objection at 17. In addition, Cristofoli received 96,471.46 in income and $285,714 in K-1 income in 2020, similar to his compensation in 2019 of $112,284.65 in income and $290,782 in K-1 income. *Id.* Debtor states that the W-2 income is below-market rates, and that "on account of their ownership interests, the Debtor's principals were allocated additional income for tax purposes, but this represents pass-thru

income from the tax attributes of the Debtor, not actual distributions." Reply at 3. Further, Rosa states that "Debtor's principals did receive distributions in the year before the bankruptcy filing, and they used the money to shore up an affiliate and avert its default on a debt guaranteed by the Debtor, and intend to re-invest the balance in the Debtor as a contribution of the new value." *Id.*

Indeed, Rosa explained as much in their [R. 102] Objection to MTD. Approximately $203,500 was disbursed in October 2020 to Venosa as a capital contribution to Venosa. Objection to MTD at 14; Tatman Affidavit at 5–6. Rosa explains that at the time, Venosa was experiencing difficulties with cash flow and Tatman and Cristofoli were concerned this would result in a default on one of its loans where Rosa Mosaic would be required to pay as a guarantor. Objection to MTD at 14; Tatman Affidavit at 6. An additional approximate $20,000 was disbursed to Venosa in July 2021 for the same reason. *Id.* The remainder insider distributions remain in an account jointly owned by Cristofoli and Tatman, which were set aside in anticipation of pass-through tax obligations. *Id.* However, because Rosa did not incur as much tax liability as anticipated, Debtor intends to use the remainder of these funds to be used as the bankruptcy case proceeds. *Id.*

When looking to Tatman and Cristofoli's income from 2019 to 2020, both owners received about $15,000 less in income, which corroborates Tatman's testimony that neither she nor Cristofoli received W-2 income for part of 2020. *See* 2004 Examination of Debtor, [R. 93-14 at 121–22]; Tr. 290:1–291:5. The Debtor has explained multiple times that the excess income has been used to

avoid a default on a debt guaranteed by Rosa and for pass through income.  This Court is not persuaded by the Union that Rosa is "exorbitantly compensated."

Where Rosa has attempted to cut costs elsewhere, reducing labor costs is valid.  "[L]abor costs must sometimes be reduced for successful reorganization even if they are not to blame for the debtor's plight."  *In re Ind. Grocery Co., Inc.*, 138 B.R. 40, 47 (Bankr. S.D. Ind. 1990) (citing *In re Big Sky Transp. Co.*, 104 B.R. 333, 338 (Bankr. D. Mont. 1989)).  In *Indiana Grocery*, the court found that "[debtor] had made substantial efforts to reduce costs elsewhere, including compensation for top management" and "[r]educing costs, including labor costs, [was] an essential element [for debtor's] chance for success."  138 B.R. at 47. Here, Debtor's projections show that labor costs are consistently its second highest expense, showing that labor costs are indeed a significant share of the total expenses.  *See* [R. 137-3; R. 137-16].  While the Union is correct that materials are a larger cost, Debtor cannot control the cost of materials whereas it can control the cost of labor.  Cristofoli testified that he had asked their material suppliers to reduce costs, but the request was refused. Tr. 109:17–20. This is corroborated with Tatman's testimony that the increase in costs is largely due to "an extremely high increase in resins," Tr. 173:23, and "resins are hardly available . . . . So it's hard to negotiate price with suppliers when there isn't even enough supply." Tr. 273:3–9.

Similar to *Indiana Grocery*, Debtor has made substantial efforts to reduce other costs, including compensation to its owners.  Where Rosa has reduced costs in essentially every avenue it could, reducing labor costs is essential to

46

Rosa's successful reorganization.  The Union has not met its burden to show that Rosa's proposals are not necessary to reorganization.

**D.      Rosa's Proposed CBA Modifications Treat the Union, Debtor, and All Other Affected Parties Fairly and Equally.**

Rosa must next show by a preponderance of the evidence that the proposed modifications to the CBA "assure[] that all creditors, the debtor and all of the affected parties are treated fairly and equally."  11 U.S.C. § 1113(b)(1)(A); *Ky. Truck Sales*, 52 B.R. at 800.  *Ky. Truck Sales* elaborated on this particular requirement of Section 1113:

> This requirement of section 1113 is intended to ensure that where a trustee or debtor-in-possession attempts to reject a collective bargaining agreement, the union members covered by the agreement 'do not bear either the entire financial burden of making the reorganization work or a disproportionate share of that burden' (internal citation omitted).   In other words, all parties affected by the bankruptcy must have made or be willing to make contributions to the debtor's reorganization which are proportionate to the concessions contained in the bargaining proposal.  This requirement of equivalent sacrifice does not mean that the debtor must formally propose his plan of reorganization prior to seeking rejection of the collective bargaining agreement.  Rather the court must look not only to the changes proposed, but also to concessions to be made by creditors, stockholders or owners of the debtor, as well as by other nonunion employees.

*Id.* at 802.  A proposal made under section 1113 satisfies the requirement for fair and equitable treatment if, based on the facts available at the time of the hearing, the court is able to find that the proposal is generally fair to the affected employees compared to the impact on other parties in interest, or that the affected parties are shouldering a proportionate share of the cost-cutting measures.  *See In re Blue Diamond Coal Co.*, 131 B.R. 633, 646 (Bankr. E.D.

Tenn. 1991) ("Equity under § 1113 means fairness under the circumstances, not a comparative dollar-for-dollar concession"); *In re Allied Delivery Sys. Co.*, 49 B.R. 700, 703 (Bankr. N.D. Ohio 1985) ("Fair and equitable treatment does not of necessity mean identical or equal treatment."); *see also* 7 Collier on Bankruptcy P 1113.05 (16th 2022).

Here, Rosa lists six ways where it first reduced costs before submitting its proposal to the Union: (1) Tatman and Crisitfoli did not receive W-2 income for October through December 2020 or for January, February, and July through September 2021; (2) Rosa terminated its contract with its business development contractor to save on the monthly retainer and expenses, averaging $2,000 per month; (3) Rosa introduced a high-deductible health benefits plan and health savings account to minimize health insurance costs, saving 10% of health benefits costs; (4) Rosa outsourced its payroll function in July 2020 when its payroll administrator retired, saving $11,380.00 per year; (5) Rosa did not replace its project manager when he left for another opportunity in January of 2021; (6) Rosa took certain actions, in conjunction with its bank and bonding company, to reduce annual accounting fees by 10%. Motion to Reject at 11. These concessions, especially where Tatman and Cristofoli waived part of their W-2 income, demonstrate Rosa is bearing its proportionate share of the financial burden. Additionally, as discussed *supra* in Section C, Rosa's proposal to reduce labor costs is not disproportionate to its expenses.

The Union argues in its post-hearing brief that Rosa is preferring all other parties over the Union. Union's Brief at 10. Specifically, the Union alleges that Rosa has given preferential treatment to material suppliers over its own

workforce through a series of preferential transfers, and by refusing to ask said suppliers to accept a reduced rate on their claims. *Id.* Further, the Union takes umbrage with the fact that Rosa continues to pay rent to Wilder Park, the leasing company in which Rosa's insiders Tatman and Cristofoli each own 50%, without seeking a rent reduction. *Id.*[11]

First, regarding the arguments concerning Rosa's rent, Rosa does not dispute that it continues to pay the same amount of rent to Wilder Park. At the evidentiary hearing, Cristofoli confirmed that Rosa still pays the same amount of rent it had paid prepetition – $81,000 per year – to Wilder Park. *See* Tr. 71:9–72:14; *see also* Tr. 201:12–14; Tr. 203:8–17. But Rosa's continued rent payments to an insider-owned entity is not *prima facie* evidence of its treating all affected parties unfairly. Notably, in *Ky. Truck Sales*, the court discussed at length the union's allegations that the debtor's principle owner, Mr. McGuirk, failed to make his own concessions and sacrifices to cut costs, including the fact that he owned the building on which the debtor was paying rent. Still, the court found no evidence that the rent payments were indicative of unfairness, concluding that McGuirk was "not taking unfair advantage of the debtor" and was "making his fair share of concessions in order to aid the debtor in its reorganization attempt." 52 B.R. at 803. The *Ky. Truck* Sales court specifically held:

> First, while it is true that McGuirk owns the building where the debtor's business is located, no evidence was presented by the union that the terms of the lease were either unfair or uneconomical. After reviewing the financial records we

---

[11] The Court notes that the Union's Objection makes no arguments concerning Rosa's rent to Wilder Park or Wilder Park's ownership. The Union raised those issues for the first time at the January 25, 2022, evidentiary hearing and subsequently in the Union's Brief.

> cannot find any evidence which indicates that the lease is unfair to the debtor. . . .
>
> . . . Although a transaction between a controlling shareholder and the corporation is always subject to close scrutiny, it is not per se invalid. If the terms of the transaction between the corporation and its controlling shareholder are basically fair, then the effects of that transaction are the same as if they occurred between any two unrelated parties. . . .

*Id.* at 803–04. Even though the union's arguments regarding McGuirk represented its "strongest challenge to the debtor's motion to reject the collective bargaining agreement," *id.* at 803, the arguments still failed since the union produced no evidence as to the inherent unfairness of the lease terms or the insider transactions.

Like in *Ky. Truck Sales*, here the Union has presented no evidence that the terms of the Wilder Park lease, or the amount of annual rent paid, are fundamentally unfair or uneconomical. The Union provides the barebones statement that "Rosa is paying the same rent to Wilder Park, another company the insiders own," Union's Brief at 10, but fails to explain why or how Rosa receives some unfair benefit merely by continuing to pay the same rent to the same entity it had paid prepetition. If anything, Tatman's testimony indicated that the rent Rosa pays to Wilder Park is actually affordable compared to other markets. Tr. 203:20–204:7. The Union meanwhile provides no arguments or evidence as to why $81,000 per year is unreasonable or inflated, how the rent could theoretically be reduced, or how Tatman and/or Cristofoli are profiting from continued rent payments to Wilder Park, if at all. The fact that Wilder Park also leases property to entities with no affiliation to either Tatman or Cristofoli, Tatman Affidavit at 4, further assuages any concern that Rosa's insiders

improperly benefit from rent payments to Wilder Park.  While true that Rosa's principles own Wilder Park, such a relationship "is not per se invalid," *Ky. Truck Sales*, 52 B.R. at 804, and the "mere fact that there have been inter-company transactions between a debtor and its owner is not a source of unfairness to other creditors unless the transactions themselves were financially unfair to the debtor." *Carey*, 816 F.2d at 91.

Second, regarding the Union's arguments that Rosa's preferential payments prejudices the Union, and that Rosa's principles should clearly sacrifice more, the Court finds those arguments unsupported by the record.  For one, as established at the evidentiary hearing, Tatman and Cristofoli waived receiving their W-2 income ($10,000 per month) for October through December 2020, and for January, February, and July through September 2021. Tr. 290:1–292:3.  Rosa also implemented other cost reducing measures and is resorting to reduction in labor costs where it is unable to save money elsewhere.

Rosa's proposed modifications included a proposed decrease of wages paid to its union employees from the higher rates required under the CBA, based on its claim that Rosa pays its workforce nearly 18-20% more than its non-union competitors, Motion to Reject at 2, stifling its ability to remain competitive. Though the Union balks at the fairness of this proposal, arguing that "Rosa is asking for the union workforce to slash their wages and benefits while insiders and material suppliers maintain the status quo," Union's Brief at 11, as multiple courts have noted, equity in this analysis does not mean dollar-for-dollar concessions.  *See, e.g.*, *Blue Diamond*, 131 B.R. at 646.  "The debtor is not required to prove, in all instances, that managers and non-union employees will

have their salaries and benefits cut to the same degree that union workers' benefits are to be reduced . . . . Rather, a debtor can rely on proof that managers and non-union employees are assuming increased responsibilities as a result of staff reductions without receiving commensurate salary increases; this is surely a sacrifice for these individuals." *Carey*, 816 F.2d at 90.  Though Rosa and the Union are perhaps not making equivalent concessions, Rosa and its principles have indeed made sacrifices to save costs, which the Court finds generally "proportionate to the concessions contained in the bargaining proposal." *Ky. Truck Sales*, 52 B.R. at 802.  Given Tatman and Cristofoli's decision not to receive salary in recent months, the Debtor's proposal is in line with case law on the matter, and not inherently unfair or preferential.

Ultimately, the crux of the Union's objection under this "fairness" factor is that Rosa has not sacrificed enough, while the Union is sacrificing too much, but the Court finds Rosa's concessions to be ample evidence of its affected principals making reasonable fiscal sacrifices where possible.  As to the underlying fairness of the proposals, Tatman testified at the evidentiary hearing that all Rosa's creditors would be treated fairly and equally with the suggested proposals, adding she "can't imagine anything worse than not paying the people that we owe." Tr. 180:16–19.  And as Rosa's motion to reject avers, there is "nothing more to cut," [R. 110 at 11], a claim supported by the testimony from PNC's representative that Rosa's financial performance has floundered in recent years.  Tr. 134:8–12.

The Court is persuaded that these concessions, as well as the proposals to modify the CBA, were aimed at Rosa's long-term goals of helping the company

52

survive and potentially creating new opportunities to allow Rosa to remain competitive. Rosa has shown by a preponderance of the evidence that the proposed modifications to the CBA ensure that the debtor, creditors and all other affected parties, including the Union, are treated in a fair and equitable manner.

**E.    Debtor Provided Enough Relevant Information for the Union to Evaluate the Proposal.**

Next, Rosa must show that it provided the Union with all relevant information necessary to evaluate Rosa's proposal. 11 U.S.C. § 1113(b)(1)(B); *Ky. Truck Sales*, 52 B.R. at 804. In *Ky. Truck Sales*, the Court found this element was satisfied, despite minor delays in production, where the debtor opened its financial books to the union for examination: "Although the information has at times been late in coming to the union, all delays have been attributable to putting financial information in a usable form. The debtor has constantly offered to allow the union to examine its books and financial records in detail, an offer which the union has, for the most part, declined." *Id.* at 804.

Here, Rosa has provided the following to the Union: financial projections, federal tax returns, evidence of payments to insiders and management, monthly balance sheets and income statements, 2019-2021 job costs on tile projects, information relevant to specific tile projects, insider loan documents and guarantees, a list of all work under contract through September 2021, the 2021 Anthem health care plan cost summary by category and coverage, Rosa's response to the apprenticeship Union audit, additional Anthem health, vision, and dental plan information for 2021-2022, a list of Rosa's current field employees, and Union contribution reports. Motion to Reject at 14. Rosa has

remained transparent with the Union throughout negotiations, providing thousands of documents and hours of depositions to assist the Union's analysis. Tr. 145:7–146:23, 180:16–181:2. When questioned at the hearing whether Rosa "provided to the union all the information, the documents that you had control of," Tr. 180:22–23, Tatman replied, "I can't imagine anything they haven't seen honestly." Tr. 180:24. Tatman explained that, since the Union initiated the Vesta Litigation commenced in September 2019, the litigation-related production demands have been immense, with Rosa's relatively small team of employees struggling to produce what they could in a timely fashion:

> Q:     And tell me just real briefly what was required of you as president of Rosa Mosaic in that litigation. I mean, how much time did you have to spend?
>
> A:     It sounds like a glorious name, president, but we're a very small company. So myself and our comptroller, Dennis Burch, and Tracy, one of our accounting clerks, spent days and days and days producing. I think at one time -- at one point, I heard 43,000 documents. We went through numerous day-long depositions, a lot of conversations on the telephone with general contractors that had gotten subpoenas from Mr. Schwartz, wondering what was going on. So it was just – I mean, we were going -- and the attorneys, our attorneys, had tried to limit the discovery to from 2015 forward, but they insisted to going back to 2010. So maybe we were trying to cover 10 years of documentation. It was payables, receivables, contracts, bid documents, just all -- union reports, payroll records. It was all-consuming it [sic].
>
> Q:     How many depositions did they take?
>
> A:     Several. They deposed just about everybody, I think, in our company and even our retired bookkeeper. They called her back to depose her, and they took affidavits of some of our general contractors.

Tr. 145:10–146:6.

The Union objects that Rosa failed to meet this requirement because Rosa "never identified an objective of how much cost savings it needed each year." Union's Brief at 9. The Union argues that, although it had requested information explaining Rosa's proposed rates for wages and benefits, Rosa never provided any written information supporting a reduction in wages or benefits and Rosa allegedly admitted as much at the evidentiary hearing. *Id.*; *see* Tr. 242:15–18. Claiming this information is "vital to evaluate the necessity of a wage reduction or a change in benefits", Union's Brief at 9, the Union argues this element has not been met. However, Rosa provided financial projections to the Union with its CBA. The projections display Rosa's expenses, where labor costs are consistently a significant expense. At trial, Tatman stated that the concept behind the proposals is for Rosa to become more competitive in tile work, with a goal that by 2025, to have their tile and terrazzo work percentages similar to their percentages in 2018. Tr. 179:14–18. This is supported by the fact that Rosa has provided updated projections showing comparative future profits under the current CBA versus a CBA with Rosa's proposals.

Given the apparent degree of transparency underlying these vast disclosures, and in light of the significant volume of material produced and hours expended by Rosa's work force, the Court is persuaded that Rosa sufficiently opened its financial records up to the Union for examination and has thus satisfied this element.

## F. The Union Refused to Accept Debtor's Proposal Without Good Cause.

Next, Rosa must show that the Union refused to accept Rosa's Proposals without good cause. 11 U.S.C. § 1113(c)(2); *Ky. Truck Sales*, 52 B.R. at 804–06.

Citing the Wyoming Bankruptcy Court's opinion in *In re Salt Creek Freightways*, 47 B.R. at 840, the *Ky. Truck Sales* court explained this penultimate requirement as follows: "it is not necessary to find that a Union has rejected the debtor's proposal in 'bad faith' or for some contrary motive. In fact, the Union may often have a principled reason for deciding to reject the debtor's proposal and which may, when viewed subjectively and from the standpoint of its self-interest, be a perfectly good reason. However, the court must review the Union's rejection utilizing an objective standard which narrowly construes the phrase 'without good cause' in light of the main purpose of Chapter 11, namely reorganization of financially distressed businesses." 52 B.R. at 805. Additionally, the Union must participate meaningfully in the negotiations and explain its reasons for opposing the proposal. *Mile Hi Metal Sys. Inc.*, 899 F.2d at 892 (citing *Carey,* 816 F.2d at 92).

Rosa asserts that the Union rejected the proposal without good cause "when it stated: (i) its policy was to not negotiate employee pay; (ii) it would not negotiate benefits provided in the health and pension fund; (iii) it would not negotiate on returning the proceeds from the market recovery program to the employees; and (iv) it would not entertain ending the backbreaking litigation against Rosa (which is one of the factors that forced the Debtor into bankruptcy to begin with)." Motion to Reject at 15–16. Rosa goes on to cite *Ky. Truck Sales*, stating that while the Union may have good reason to reject the proposal, reasonableness alone does not constitute good cause. *Id.* at 16.

Rosa also points to the Union's conduct during the negotiations. During the evidentiary hearing, the Court heard from the chapter V trustee, who stated

that she participated in the negotiations with the Union and the October 1113 conference. Tr. 361:19–22, 363:1–3. The trustee found the bargaining session "to be almost immediately caustic and hostile, at least from the union perspective" and that "[i]t was a challenge to get past even the first line of communication." Tr. 363:4–6. The subchapter V trustee also provided that "the biggest problem throughout the entire remainder of the negotiations" was the Union's "all-or-nothing" position on Vesta, allowing no middle ground with the debtor making a payment to settle the dispute. Tr. 364:1–9. Accordingly, the trustee recognized that there was no point in further negotiations. Tr. 354:18–25.

The Union's post-trial brief alleges that Rosa never provided any information supporting a reduction in wages or benefits, information which is vital and necessary to the Union's evaluating the proposals. Union's Brief at 10. The Union specifically objects to the fact that Tatman prepared the projections submitted with the bargaining proposals without consulting Rosa's accountant. *Id.* Yet at the evidentiary hearing, Rosa called as a witness its long-time CPA, Christopher Ward, who testified that he was well familiar with Rosa's overall finances and had discussed the projections with Tatman prior to the hearing:

> Q:    And would -- based on working with Rosa Mosaic for 25 years, are you familiar with their financials and their business model?
>
> A:    Yes, sir.
>
> Q:    Did you have more than one meeting with Anna regarding these projections? Or any -- I know you really didn't have a meeting, but any additional phone conversations with her to discuss these projections any further?

> A:    Last week we discussed -- I wanted to refresh my memory on a couple things on the spreadsheet, so we had a phone call.

Tr. 208:15–24.  Rosa's CPA went onto testify that, based on his twenty-five years of experience with Rosa's financials, their money situation was clearly depressed and on the downturn, due at least in part to Union-imposed costs:

> Q:    Based on your 25 years as the CPA for Rosa Mosaic and your familiarity with Rosa Mosaic's financials, do you believe that these projections are reliable based upon the information that you reviewed?
>
> A:    Yes, I do, based upon some of the methodologies and assumptions that were made, I do.
>
> Q:    Mr. Ward, I want you to turn now to Exhibit 17.  And these projections, is it -- it says at the top there, projections.  If Rosa Mosaic were not under the collective bargaining agreement.
>
> A:    Yes.
>
> Q:    Did you review these projections as well?
>
> A:    Yes, I did.
>
> Q:    And did you discuss these with Ms. Tatman during the couple phone calls that you had with her?
>
> A:    I didn't discuss this spreadsheet in particular with her.  I did discuss the fact of what things would look like without the CBA expenses included.
>
> Q:    Okay. And what is your understanding, based on your review of their financials and doing their tax returns on their revenues?  I mean, are they staying constant?  Are they going down?
>
> A:    They're -- yes, they're trending downward for probably a few different reasons.
>
> Q:    And, I mean, do you know any reasons why, or --
>
> A:    They're trending downward due to -- I mean some of it has to do with the union expenses and the fact that they have to pay a higher wage rate per hour to their workers than a company that does not have those expenses.  They're trending downward because of

> more competition, and the fact that the competition is non-union and can bid jobs at a lower cost, which causes the company not to be able to obtain work that they otherwise would. I mean, those are probably some of the primary reasons.

Tr. 210:4–211:11. Despite the Union's argument that Rosa's accountant was unable to provide reliable information as he was not familiar with the express terms of the CBA or the competitiveness of the tile market, Union's Brief at 10, the Court affords significant weight to Ward's testimony, given his lengthy history with Rosa and hands-on experience with their finances.

Significantly, Ward's testimony is in line with the testimony heard from PNC's representative Andrea Kinser, who testified as to why the bank ultimately withdrew Rosa's $500,000 line of credit in September of 2020, explaining that the risk was higher due to Rosa's worsening financial performance. Tr. 130:13–131:6. While the Union took issue with the reliability of the projections from Rosa's CPA and its resulting inability to surmise the actual financial situation from the numbers provided, Kinser's testimony underscored that PNC had any and all financial data it required to make a determination about Rosa's finances. Kinser's testimony reflected that PNC reviewed tax returns, financial statements, balance sheets, and the unfunded pension liability. Using this data, the bank was able to formulate its decision to withdraw the credit from Rosa, Tr. 133:7–20, and felt it prudent to do so.

Given that the Union's primary argument for why it had good cause to reject Rosa's Proposals is that it lacked reliable, detailed data to support Tatman's projections and spreadsheets, the Court is unpersuaded by that argument. Both Rosa's long-time CPA and an independent representative from PNC gave practically the same testimony: Rosa's recent financials and

projections looked increasingly dire, leading the bank to walk away and forcing Rosa to make some cost-cutting measures. Although the Union demanded more objective evidence of said projections, the Court rejects this demand as a good faith basis for rejecting Rosa's proposals, given the vast amount of financial information made available to the Union and the persuasiveness of the testimony provided by Rosa's witnesses. Further, the Union exhibited poor behavior during negotiations and refused to budge in negotiations. This accentuates that the Union did not have good cause to reject the proposals

**G.  The Balance of Equities Favor Rejection of the CBA.**

Finally, Rosa must establish that the balance of the equities clearly favors rejection of the CBA. 11 U.S.C. § 1113(c)(3); *Ky. Truck Sales*, 52 B.R. at 806. The primary question in this balancing test is the effect the rejection of the agreement will have on the debtor's prospects for reorganization. *Ky. Truck Sales*, 52 B.R. at 806. This Court finds the present facts again analogous to those in *Ky. Truck Sales*, where the debtor was losing money despite the concessions made, and where the court determined that granting the debtor's motion to reject the CBA would increase its overall chance of survival: "In this proceeding the rejection of the debtor's collective bargaining agreement would give the debtor a chance to rehabilitate itself. The debtor has shown that without the rejection of its present collective bargaining agreement it will soon be forced to cease operations and liquidate. The debtor has clearly shown that even with all the nonlabor cost reductions it has already made it is still losing money." *Id.*

Based on the testimony heard at the hearing, Rosa is in similar dire straits: despite many concessions made and income waived by is principals, it continues

to trend into the negative, to the point where its line of credit with PNC has been terminated. As was demonstrated via evidence and testimony at the hearing, Rosa's most up-to-date projections show losses for 2021, 2022, and the foreseeable future, assuming Rosa is required to operate under the CBA in its current iteration. Rosa's Brief at 4. As discussed above, Rosa's former banker testified that PNC refused to renew its line of credit on the terms it had previously extended due to Rosa's downward-trending financial performance. Tr. 130:13–134:15. Rosa's accountant likewise confirmed that the labor costs imposed by the CBA are causing Rosa's financial performance to suffer. Tr. 211:1–11.

Frankly, the Court wonders how Rosa is expected to stay afloat without some of the proposed CBA changes and cost-cutting measures it has taken. As Tatman testified, the proposals were all aimed at creating opportunities by adding new employees to enable to Rosa to survive in a competitive market:

> [O]ur goal is to continue to grow this business, not shrink it. And so by . . . allowing us to have this training program, and to have a classification of worker called thinset commercial tile setter and tile finisher allows us to train, spend two years training these people, guarantee a minimum wage at that level, and then see them grow into the business, whatever they want to do. If they want to continue to go forward and become more skilled, be a terrazzo worker, they can do that. In the meantime, we can provide for our workforce to have consistent work if we can compete against the non-union tile contractors, and that's the only way we're going to do that.

Tr. 164:9–20. Combined with the elimination of expenses associated with the Indianapolis apprenticeship program and the Market Recovery Program, and the costs of compliance with the Union's administrative requirements, the Court is persuaded that Rosa is trying to save money that it can subsequently invest in operations, provide current employees with better compensation, and expanding its workforce. Tr. 183:16–185:14.

Based on the available testimony and evidence, Rosa's Proposals were not inherently unfair or designed to improperly leverage the Union. If anything, they are necessary, given the financial state of the debtor and plummeting projections. Where the Union's CBA demands stifle Rosa's ability to compete, and given that its insistence that Rosa reenter the Union's pension funds and participate in its healthcare plan exacerbate Rosa's problems, the equities do favor rejection of the CBA under § 1113(c)(3). The eighth *Ky. Truck Sales* element is satisfied.

As the court in *Ky. Truck Sales* recognized, rejection of a CBA is not the final nail in the parties' negotiations. Indeed, rejection represents "not . . . an end but rather a new phase in the negotiations between [the] parties." *Ky. Truck Sales*, 52 B.R. at 806. For the foregoing reasons, this Court **GRANTS** Debtor's [R. 110] Motion to Reject Collective Bargaining Agreement.

Charles R. Merrill
United States Bankruptcy Judge
Dated: August 11, 2022

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| IN RE: ) | |
| ) | |
| ROSA MOSAIC & TILE COMPANY, ) | Case No. 21-31649-crm |
| ) | |
| ) | Chapter 11 |
| DEBTOR ) | |
| ) | |
| _____ ) | |

\* \* \* \* \*

## ORDER

For the reasons set forth in this Court's Memorandum Opinion filed contemporaneously herewith, this Court **GRANTS** Debtor's [R. 110] Motion to Reject Collective Bargaining Agreement.

Charles R. Merrill
United States Bankruptcy Judge

Dated: August 11, 2022